IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
NO. 5:13-CV-00138-BR

| | |
|---|---|
| KEITH EDWARD FRAZIER,<br>      Plaintiff,<br><br>    v.<br><br>JEFFREY BAXTER, CHARLES FARRAR,<br>JESSE DICKINSON, JERRY SEIGHMAN,<br>ISAAC BARRET, CITY OF WASHINGTON,<br>CITY OF GREENVILLE,<br>      Defendants. | ORDER |

This matter is before the court on defendant Jerry Seighman's ("Seighman") motion for summary judgment. (DE # 85.) Plaintiff Keith Frazier ("Frazier") filed a response in opposition to the motion, (DE # 99), to which Seighman filed a reply, (DE # 100). Frazier then filed a sur-reply.[1] (DE # 101.) In turn, Seighman filed a motion to strike Frazier's sur-reply. (DE # 102.)

## I. BACKGROUND

Frazier commenced this *pro se* 42 U.S.C. § 1983 action against a number of law enforcement officers, including Seighman, and the cities which employed them arising from five incidents involving encounters between him and the officers occurring from 21 February 2011 to 7 April 2011. On 15 September 2014, the court granted one set of defendants' motion for judgment on the pleadings, granted in part the other set of defendants' motion for judgment on

---

[1] In several of Frazier's filings, he claims that he has not received the motion for summary judgment or its supporting documents. (DE ## 89, 93, 99.) In one of those filings, he requests that counsel be appointed for him to ensure receipt of all documents filed. (DE # 93, at 2.) Seighman represents that he has served Frazier with copies of the subject filings multiple times. (See DE ## 85, 86, 94, 97.) Frazier's response and sur-reply evidence that he has adequately addressed Seighman's arguments, and there is no need to delay ruling on the motion for summary judgment or appoint counsel to represent Frazier.

the pleadings, and denied Frazier's motion for summary judgment. What remains is Frazier's § 1983 claim against Seighman based on alleged violations of the Fourth Amendment arising out of traffic stops on 21 February 2011 and 3 March 2011.

## II. STANDARD OF REVIEW

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "In determining whether a genuine issue of material fact exists, the Court views the evidence in the light most favorable to the non-moving party." Martin v. Lloyd, 700 F.3d 132, 135 (4th Cir. 2012) (citation omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (internal quotation marks and citation omitted). Of course, the court is "always obliged to construe liberally the contentions being pursued by pro se parties." Sinclair v. Mobile 360, Inc., 417 F. App'x 235, 243 (4th Cir. 2011) (citing Gordon v. Leeke, 574 F.2d 1147, 1151 (4th Cir. 1978)).

## III. DISCUSSION

**A. 21 February 2011 traffic stop**

Seighman is employed as a police officer with the City of Washington, North Carolina. On 2 February 2011, an armed robbery took place at the local Walmart. (Seighman Aff., DE # 85-1, ¶ 2.) A black Dodge Magnum appeared to have been involved in the robbery. (Id.) Officer Isaac Barrett, who was in charge of the robbery investigation, asked Seighman to be on the lookout for a black Dodge Magnum and identify its driver if possible. (Id. ¶¶ 2, 3.)

On 17 February 2011, Seighman received an email from Dorothy Burgess, the housing

2

manager at Clifton Meadows, a property owned or managed by the Washington Housing Authority. (Id. ¶ 5.) Seighman is authorized as an agent of the Washington Housing Authority to banish individuals from its property and arrest individuals for trespassing, and he routinely patrols Clifton Meadows and the surrounding area. (Id. ¶ 4 & Ex. A.) Burgess reported to Seighman "suspicious activity" involving a black car with the license plate ZZZ 5015. (Id. ¶ 5 & Ex. B.) She noted that the black car and a white car constantly travel together in hour-and-a-half intervals and that the occupants "hang out" at Apartment 145 and appear to have access the apartment when the female tenant is at work. (Id., Ex. B; see also id. ¶¶ 5, 6.)

On the afternoon of 21 February 2011, Seighman observed a black Dodge Magnum with license plate ZZZ 5015 traveling on West 9th Street. (Id. ¶ 7.) The vehicle stopped and picked up a black male passenger. (Id.) Realizing that the vehicle was the one referenced in the email from Burgess and might be the vehicle associated with the earlier Walmart robbery, Seighman began following the vehicle to attempt to identify the driver and passenger. (Id.; see also Frazier Aff., DE # 99-2, ¶ 2.) The front seat passenger looked back at and watched Seighman as he followed the vehicle. (Seighman Aff., DE # 85-1, ¶ 8.) Seighman followed the vehicle as it turned into the parking lot at Clifton Meadows. (Id. ¶ 9; see also Frazier Aff., DE # 99-2, ¶ 4.) Frazier, who was driving the vehicle, pulled it into a parking space. (Frazier Aff., DE # 99-2, ¶ 7; see also Seighman Aff., DE # 85-1, ¶ 10.) Seighman pulled behind the vehicle, blocking it in. (Frazier Aff., DE # 99-2, ¶ 7.) As Seighman approached the vehicle, the black male passenger got out of the vehicle and ran away. (Seighman Aff., DE # 85-1, ¶ 11.)

Seighman asked Frazier for his license and registration. (Id. ¶ 12.) Seighman asked Frazier who the fleeing passenger was. (Id.) Frazier denied knowing the passenger and stated

3

he was just giving him a ride. (Id.; see also Frazier Aff., DE # 99-2, ¶ 5.) Seighman placed Frazier in handcuffs and patted him down for weapons, whereupon Seighman discovered $5000 in Frazier's pocket. (Seighman Aff., DE # 85-1, ¶¶ 13, 14.) Seighman placed Frazier in his patrol car and searched the passenger's and driver's sides of the vehicle for weapons. (Id. ¶ 16.) He found no weapons or contraband. (Id.) Seighman smelled "a moderate to strong odor of an alcoholic beverage coming from Frazier," who "admitted that he had drank a 'beer and a half.'" (Id. ¶ 17.) Seighman administered an alcosensor test on Frazier, which registered .03. (Id.)

Frazier's driver's license listed a Greenville address. (Id. ¶ 18.) When Seighman ran the license, the address listed was 145 Clifton Meadows. (Id.) Frazier admitted he did not live at the address but had been staying there with his girlfriend and used it as his mailing address. (Id. ¶ 19.) Seighman removed the handcuffs from Frazier and allowed him to return to the vehicle. (Id. ¶ 21.) "Because Frazier had been drinking, and because he was using the address in Clifton Meadows improperly as his mailing address," Seighman "filled out and had Frazier sign a banishment notice" for all Washington Housing Authority property. (Id. ¶ 22 & Ex. E.) Frazier then left the scene. (Id. ¶ 25.) Seighman's encounter with Frazier lasted approximately 20 minutes. (Id.)

Frazier alleges that Seighman pulled over the vehicle he was driving solely to identify who he was and that he had not committed a traffic offense or any other criminal offense. (Compl., DE # 5, at 3, 7.) He contends that Seighman's stop of the vehicle constituted a seizure which must be supported by probable cause. (Resp., DE # 99, at 3.) While the existence of probable cause to be believe a traffic violation has occurred justifies a traffic stop, so too does reasonable suspicion of criminal activity. United States v. Hassan El, 5 F.3d 726, 730 (4th Cir.

4

1993).

>  A law enforcement officer may initiate a brief investigatory stop if the officer has reasonable suspicion to believe that "criminal activity may be afoot." *Terry v. Ohio*, 392 U.S. 1, 30, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968). In determining whether an officer had reasonable suspicion, we view the totality of the circumstances to determine whether the officer had "a particularized and objective basis for suspecting the particular person stopped of criminal activity." Although the reasonable suspicion standard "defies precise definition," it is less demanding than probable cause and falls "considerably short of satisfying a preponderance of the evidence standard."

United States v. Griffin, 589 F.3d 148, 152 (4th Cir. 2009) (most citations omitted).

Based on the totality of the facts presented to Seighman, he had reasonable suspicion to stop the vehicle. The vehicle Frazier was driving matched the description of a vehicle believed to have been involved in a relatively recent armed robbery. The vehicle's color and license plate matched the vehicle whose driver had been accessing and staying at an apartment in Clifton Meadows, yet the driver was not a tenant there. The passenger engaged in suspicious behavior by looking back at the officer as the officer followed in his patrol car. The combination of these facts provided Seighman with reasonable suspicion that criminal activity may be afoot. That Seighman blocked in the vehicle does not alter the court's analysis. See United States v. Manbeck, 744 F.2d 360, 377 (4th Cir. 1984) ("This Court has already rejected the notion that officers transform a Terry stop into an arrest by virtue of blocking the progress of a vehicle and drawing their weapons when approaching. The former is a reasonable way of effectuating the stop of a motor vehicle, and the latter is a justified safety precaution." (citations omitted)).

Frazier also alleges that Seighman forced him to submit to a breathalyzer[2] under threat of

---

[2] Frazier refers to the alcohol screening test as a "breathalyzer." The breathalyzer and alcosensor are devices that are used for breath alcohol screening. Michael A. Correll, Is There A Doctor in the (Station) House?: Reassessing the Constitutionality of Compelled DWI Blood Draws Forty-Five Years After Schmerber, 113 W. Va. L. Rev. 381, 385 (2011). For purposes of the court's analysis, it is irrelevant which device was used to test Frazier.

5

revoking his driver's license. (Compl., DE # 5, at 3, 7.) Under North Carolina law, "[a] law-enforcement officer may require the driver of a vehicle to submit to an alcohol screening test within a relevant time after the driving if the officer has . . . [a]n articulable and reasonable suspicion that the driver has committed an implied-consent offense under G.S. 20-16.2, and the driver has been . . . lawfully stopped or lawfully encountered by the officer in the course of the performance of the officer's duties." N.C. Gen. Stat. § 20-16.3(a)(2). An offense involving impaired driving is an implied-consent offense. Id. § 20-16.2. "Requiring a driver to submit to an alcohol screening test in accordance with [§ 20-16.3(a)] does not in itself constitute an arrest." Id. § 20-16.3(a).

Here, Seighman had reasonable suspicion (even probable cause as Seighman suggests, (Mem., DE # 86, at 13)), to require Frazier to submit to the alcosensor test. Seighman witnessed Frazier driving a vehicle; he smelled a moderate to strong scent of alcohol coming from Frazier; and Frazier admitted to Seighman that he had consumed alcohol. Therefore, Seighman's requiring Frazier to take the alcosensor test was constitutionally reasonable.

In summary, both aspects of the 21 February 2011 traffic stop that Frazier challenges comport with the Fourth Amendment.[3]

## B. 3 March 2011 traffic stop

On 3 March 2011, Seighman observed throughout the day the same black Dodge Magnum he stopped on 21 February parked in Clifton Meadows. (Seighman Aff., DE # 85-1, ¶ 26.) He had seen the vehicle parked there twenty minutes prior to seeing it drive past him at an

---

[3] Although Seighman addresses other aspects of the traffic stop, such as the pat-down of Frazier, in his memorandum supporting his motion, Frazier does not challenge these aspects of the stop as violative of the Fourth Amendment in his complaint. Therefore, the court does not address them.

intersection. (Id.) Frazier was driving the vehicle, and the black male passenger in the vehicle resembled the passenger who ran during the 21 February stop. (Id. ¶ 26.) It appeared to Seighman that the vehicle had come from Clifton Meadows. (Id. ¶ 28.) Seighman stopped the vehicle and informed Frazier that he could be charged "with trespassing because of the close relation in time of the vehicle being in Clifton Meadows and Frazier driving the vehicle." (Id. ¶¶ 26, 29.) Frazier did not admit to having been on the property. (Id. ¶ 30.) Seighman gave Frazier a "break" and did not charge him with trespassing. (Id.) Frazier was allowed to leave, and the stop lasted no more than eight to ten minutes. (Id. ¶ 31.)

According to Frazier, on 3 March, the vehicle was not parked on any Washington Housing Authority property; rather, the vehicle and he had been at the home of his then-girlfriend's mother. (Frazier Aff., DE # 99-2, ¶ 11.) He drove the vehicle from that home to go to the Food Lion when he noticed Seighman behind him. (Id. ¶ 12.) Frazier's brother, who was not the passenger in the 21 February stop, was riding with him. (See id. ¶ 10.) Due to the "30% lawful tint on all the windows," which were rolled up, Frazier posits that Seighman could not have identified anyone in the vehicle.[4] (Id.) Seighman asked Frazier for his license. (Id.) Frazier confirmed with Seighman that he (Frazier) had no warrants for his arrest and that he had not committed any traffic offense. (Id. ¶ 13.) Frazier asked Seighman why he was pulled. (Id.) Seighman ignored the question, tried to get Frazier to admit to being on Washington Housing Authority property, and questioned Frazier about the passengers in the vehicle. (Id.) The encounter lasted "close to or over 10 minutes." (Id.)

---

[4] In North Carolina, windows of a vehicle may be tinted provided the light transmission of the tinted window is at least 35% and its light reflectance is 20% or less. N.C. Gen. Stat. § 20-127(b) (2001). The windshield may not be tinted except for its top five inches. Id.

7

Frazier contends that Seighman had neither probable cause nor reasonable suspicion to stop the vehicle and that Seighman's ten-minute "interrogation" following the stop was excessive. (Resp., DE # 99, ¶¶ 10, 12.) As recognized with the 21 February stop, a law enforcement officer may conduct a brief investigatory traffic stop if he or she has reasonable suspicion that criminal activity is afoot. Here, Seighman observed throughout the day the black Dodge Magnum, which he had stopped less than two weeks earlier and whose driver (Frazier) he had banished from Washington Housing Authority property, parked at Clifton Meadows. Twenty minutes before stopping the vehicle he saw it parked at Clifton Meadows. He saw Frazier drive the vehicle past him, with a black male passenger who resembled the person who ran from the earlier traffic stop, and the vehicle appeared to have come from Clifton Meadows. The totality of these facts support Seighman's reasonable suspicion to stop Frazier for trespassing. That Frazier may not have actually been at Clifton Meadows that day does not eliminate Seighman's reasonable suspicion to conduct the traffic stop. See United States v. Chanthasouxat, 342 F.3d 1271, 1276 (11th Cir. 2003) ("A traffic stop based on an officer's incorrect but reasonable assessment of facts does not violate the Fourth Amendment. Thus, if an officer makes a traffic stop based on a mistake of fact, the only question is whether his mistake of fact was reasonable." (citations omitted)). Seighman reasonably, albeit mistakenly, concluded that Frazier had been on the property given the close proximity in time of seeing the vehicle parked at the property to seeing Frazier drive the vehicle as if coming from the property. Accordingly, the stop, at its inception, was justified.

A traffic stop must also be reasonable in scope and duration to comport with the Fourth Amendment. United States v. Digiovanni, 650 F.3d 498, 507 (4th Cir. 2011).

8

> With regard to scope, "the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." With regard to duration, although the reasonable duration of a traffic stop "cannot be stated with mathematical precision," a stop may become "unlawful if it is prolonged beyond the time reasonably required to complete [its] mission." Thus, we evaluate "whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." To prolong a traffic stop "beyond the scope of a routine traffic stop," an officer "must possess a justification for doing so other than the initial traffic violation that prompted the stop in the first place." This requires "either the driver's consent or a 'reasonable suspicion' that illegal activity is afoot."
>
> Although the scope and duration components of *Terry's* second prong require highly fact-specific inquiries, the cases make possible some generalizations. When a police officer lawfully detains a vehicle, "police diligence involves requesting a driver's license and vehicle registration, running a computer check, and issuing a ticket." The officer may also, "in the interest of personal safety," request that the passengers in the vehicle provide identification, at least so long as the request does not prolong the seizure. Similarly, the officer may "inquir[e] into matters unrelated to the justification for the traffic stop," and may take other actions that do not constitute "searches" within the meaning of the Fourth Amendment . . . , but again only "so long as those inquiries [or other actions] do not measurably extend the duration of the stop."

United States v. Guijon-Ortiz, 660 F.3d 757, 764-65 (4th Cir. 2011) (citations omitted) (alterations in original).

In this case, once Seighman stopped the vehicle, he asked Frazier for his license, which he certainly could do. Based on Frazier's statement that he (Frazier) confirmed with Seighman that he had no warrants for his arrest, Seighman apparently ran a computer check, another thing Seighman could lawfully do. Seighman and Frazier engaged in some discourse about whether Frazier had been on Washington Housing Authority since his banishment, which apparently concluded with Seighman warning Frazier that he would be charged with trespassing the next time Seighman saw him at Clifton Meadows. Frazier's purported trespassing at Clifton Meadows was the reason Seighman stopped the vehicle in the first place. Accordingly,

9

Seighman had the right to investigate, for a reasonable period of time, to confirm or dispel his suspicion that Frazier had been trespassing. Given that the stop lasted approximately ten minutes, and that a portion of that time consisted of Seighman obtaining Frazier's license, running a computer check for warrants, and questioning him regarding his presence on Washington Housing Authority property, the court concludes that Seighman's additional questioning of Frazier about his passengers did not measurably extend the stop and the stop was reasonable in scope and duration. Therefore, the 3 March 2011 stop satisfies Fourth Amendment standards.

## IV. CONCLUSION

Because Seighman did not violate Frazier's Fourth Amendment rights, Seighman's motion for summary judgment is GRANTED. Seighman's motion to strike Frazier's sur-reply is DENIED. Although sur-replies are not permitted under the court's local rules, because Frazier purportedly did not receive the motion for summary judgment and its supporting materials, the court has considered the sur-reply to enable Frazier a full and fair opportunity to respond to the motion for summary judgment.

The Clerk is DIRECTED to enter judgment in favor of defendants and close this case.

This 19 February 2016.

W. Earl Britt
Senior U.S. District Judge